KNOLL, Judge.
This is the second time that a panel of this court has reviewed F.A.R., Jr.’s conviction on five counts of attempted indecent behavior with a juvenile, violations of LSA-R.S. 14:27 and 14:81. In the first instance, we upheld the trial court’s granting of a new trial because the testimony of the juvenile victim, defendant’s adopted child, was presented to the jury via closed circuit television. 533 So.2d 1071 (La.App. 3rd Cir.1988). On re-trial defendant, after waiving a jury, was again found guilty of five counts of attempted indecent behavior with a juvenile. Following a presentence investigation, the sentencing court ordered that defendant serve three and one-half years at hard labor on each count, the first three counts to run consecutively, and the last two to run concurrently. Defendant appeals his convictions and sentences, asserting three assignments of error.
EVIDENTIARY QUESTION
Defendant contends that the trial court erroneously admitted Exhibit S-3, an in globo exhibit comprised of Dr. Graciano Sison’s office notes, during the testimony of another physician, Dr. Alphonso Pacheco. When the State offered the in globo evidence, defendant objected, contending that the exhibit constituted hearsay evidence and that the State failed to qualify the exhibit under any exception to the hearsay rule.
From the outset, we must correct a factual misapprehension in defendant’s argument. Defendant is incorrect in his assertion that Dr. Sisón did not testify at the second trial. Although Dr. Sisón was unavailable to testify at defendant’s original jury trial, the record is clear that Dr. Sisón testified at defendant’s second trial. TR. 739 ff.
S-3 reflects that Dr. Sisón examined the juvenile victim in 1982, and requested a laboratory report from a gram stain on a yellowish discharge that was obtained from the juvenile victim’s vaginal opening. The lab report revealed “intercellular gram-negative diplococci bacteria”; the bacteria was not cultured for conclusive proof of the existence of gonorrhea.
At defendant’s re-trial, Dr. Pacheco, who testified prior to Dr. Sisón, reviewed Dr. Sison’s notes and findings, and opined that the juvenile victim tested positive for gonorrhea in 1982.
We find, after carefully reviewing the record of this matter, that the trial court erroneously admitted Dr. Sison’s records at that point during the trial; certainly, those records were hearsay and no exception was shown to the hearsay rule. Nevertheless, a judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused. LSA-C.Cr.P. Art. 921. Moreover, an error is harmless if there is little likelihood that it would have changed the result. State v. Ferdinand, 441 So.2d 1272 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1233 (La.1984). Even though we find that the exhibit was improperly admitted into evidence during Dr. Pacheco’s testimony, we find for reasons stated hereafter that the incorrect eviden-tiary ruling constituted harmless error.
Initially, we find that the trial court’s ruling on the admission of this- evidence was harmless because it is clear that the trial court gave no evidentiary weight to Dr. Pacheco’s testimony, and thus did not utilize his testimony in its assessment of defendant’s guilt. See State v. McKethan, 459 So.2d 72 (La.App. 2nd Cir.1984). In its oral reasons issued at the conclusion of defendant’s bench trial, the trial court stated:
“To be perfectly frank with you, I don’t believe much of anything that Dr. Pacheco says at this point because he, either he doesn’t pay any attention at all to his records or he intentionally misled the court. In either case I found, find clearly specific grounds to preclude my believing anything that the man says.”
Next, any misapprehension which Dr. Pacheco’s testimony may have caused was cleared up when Dr. Sisón testified. Dr. Sisón tempered Dr. Pacheco’s opinion, testifying that the presence of intercellular *240 gram-negative diplococci bacteria is suggestive of a sexually transmitted disease. Dr. Sisón further stated that he did not order a bacterial culture, which would have been conclusive proof of the existence of gonorrhea, because he thought the juvenile victim had never been sexually active; if he had suspected any sexual activity, he would have ordered a culture. Defendant did not cross-examine Dr. Sisón.
This assignment of error is without merit.
SUFFICIENCY OF THE EVIDENCE
Defendant contends that the trial testimony, was insufficient to support his conviction on five counts of attempted indecent behavior with a juvenile. In particular, defendant contends that the State failed to prove beyond a reasonable doubt that he committed, or attempted to commit, a lewd or lascivious act upon the person of the victim, a necessary element under LSA-R.S. 14:81.
On appellate review of the sufficiency of the evidence to support a criminal conviction, the critical inquiry is whether the evidence could support a finding of guilty beyond a reasonable doubt. The relevant question on appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Senegal, 542 So.2d 792 (La.App. 3rd Cir.1989). It is,,the role of the fact finder to weigh the respective credibilities of the witnesses and appellate courts will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the standard of review presented in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
After thoroughly reviewing the trial testimony, we adopt with approval the trial court’s well expressed summary of the evidence as follows:
“The State has charged that these violations [five counts of attempted indecent behavior with a juvenile, violations of LSA-R.S. 14:27 and 14:81] occurred on five separate occasions, between October 21, 1980, and July 16, 1985, here in La-Salle Parish, Louisiana....
[The juvenile victim] ... was born on October 21, 1970, and had by previous orders of this court been removed from the [family] ... home when these allegations arose. [The juvenile victim] ... was 16 at the time she was removed. She was first examined by Dr. Milton Rhea, an Alexandria psychologist, on June 9, 1987. Dr. Rhea also saw [the juvenile victim] ... on two other occasions, being July 3, 1987, and July 14, 1987, and he concluded that she was a severely emotionally disturbed child who felt alone, intimidated and had suffered psychological trauma for a long period of time.
[The juvenile victim] ... presented herself with an infantile voice and almost prenatal body language, according to Dr. Rhea, with much depression. Dr. Rhea did not feel that [the juvenile victim’s] ... allegations were contrived and found no secondary gain to her story to him; however, she obviously had difficulty with time, place and order of events. [The juvenile victim] ... related to Dr. Rhea five occasions of sexual abuse; all of them having occurred numerous years before her evaluation. Although Dr. Rhea recognized that children can fantasize sexual abuse he felt that such cases were so clear that they could be easily separated from the case of [the juvenile victim]....
On July 14, 1987, pursuant to a court order, Dr. Rhea made a video tape that has been made a part of this record. Dr. Rhea concluded that [the juvenile victim’s] ... degree of sexual sophistication was very immature and at that time she had no other sexual contact and found boys repulsive. The fact that her hymen was intact was not significant to Dr. Rhea because he felt a child of that tender age could suffer extreme pain without actual sexual penetration.
At the time Dr. Rhea examined [the juvenile victim] ... he recommended further psychological and psychiatric treatment.
*241 [The juvenile victim] ... began that treatment and evaluation by being admitted to Central Louisiana State Hospital in Pineville, Louisiana. There she received both group and individual therapy treatment until her eighteenth birthday.
Dr. Yolanda R. Ramdin, a psychologist, was responsible for the group therapy treatment of [the juvenile victim] ... during her hospitalization.
Dr. Ramdin found [the juvenile victim] ... to be a very disturbed and depressed child and found her to be particularly distressed about the situation she was in, partly because of her family and partly because of her father.
[The juvenile victim] ... expressed her feelings that she had been abused and was very consistent in her expressions, never wavering [sic] to Dr. Ramdin’s. Dr. Ramdin found [the juvenile victim] ... to be a very religious person who recognized the problems that she had created for her family by bringing these charges to the surface. Dr. Ramdin had no opinion as to [the juvenile victim’s] ... degree of sexual sophistication but did find her other mannerisms to reflect [the juvenile victim] ... to be very passive.
When [the juvenile victim] ... left the hospital she returned to the home of her mother and father. The hospital staff was very concerned with the situation and her feelings; that it was felt by Dr. Ramdin that [the juvenile victim] ... always put her mother before herself and this was her reason for returning.
Dr. John Simoneaux, a psychologist and director of Adolescent and Children Section of Central Louisiana State Hospital was responsible for [the juvenile victim’s] ... overall treatment program. During [the juvenile victim’s] ... hospital stay he saw her individually, in group therapy and in everyday supervision.
[The juvenile victim] ... came to the hospital as anxious and depressed as any adolescent that Dr. Simoneaux had ever seen. He found her to have a borderline IQ or mental function, but not to be retarded. In his evaluation of [the juvenile victim] ... he found that she was always concerned about her relationship with her mother and the fact that her activities would upset her mother. She felt very protective of her mother and this was one of her biggest concerns.
Dr. Graciano Sisón, a general practitioner from LaSalle parish, also testified. He examined [the juvenile victim] ... on December 9, 1982, for itching of the female external organ. He examined the genitalia and found them to be swollen. He then did a gram stain and the lab findings were suggestive of sexually transmitted diseases. Dr. Sisón suggested that the patient, had the patient been a man he would have considered it to be gonorrhea; however, since the patient was a young female it could or could not be gonorrhea and he did not follow up his examination primarily because of her age and then [the] fact that he had asked her if she had been ‘fooling around’, and she said: no. He suggested that the common thinking of the general practitioner is to stay away from this type of problem. The court finds this very difficult to accept and feels that it is quite probable that is not the common practice of the general practitioners of this area. However, unfortunately Dr. Sisón did not follow up in this matter.
Dr. Alphonso Pacheco, a pediatrics physician from Pineville, Louisiana, also testified. The court gives no consideration whatsoever to the testimony of Dr. Pacheco, as his examination clearly indicates that he had no recollection of this particular matter. The best evidence of the evaluation of Dr. Sisón is the testimony of Dr. Sisón, not that of Dr. Pacheco trying to interpret Dr. Sison’s records. The final witness to testify was [the juvenile victim] ..., who at the time is age, at this time is age 18. The court has seen [the juvenile victim] ... on numerous occasions in the previous criminal proceedings as well as the juvenile proceedings that have been had. Her personal presentation has changed very little since these matters first came to the court’s attention in May 1987. She is a shy, withdrawn and fragile person. Al *242 though 18 in physical age, emotionally she does not appear to approach that degree of maturity. She still seems intimidated in the presence of a few people and speaks only with a very whispery voice. Still, on the day of trial she took the stand and presented this court with a tremendous amount of inward strength despite the fact that out of love for her mother she has moved into the home with the man whom she accuses of sexually abusing her, she still testified directly and without equivocation.
This testimony presented the following factual scenarios: the first occasion that her father abused her was in behind the house at a time that she was approximately ten years old. She was caused to kneel down and her clothes were taken off. She suggested that his penis was placed inside of her while she was kneeling down. She indicated that it did not stay very long, that she did not bleed but that it hurt. She told her father that it hurt.
On approximately three other occasions her father would place his hand in her pajamas and would put it inside her vagina.
On one occasion in the evening she and her father were at a Coke machine in the shop behind the house and he placed her in the corner and performed the same sexual act as he had performed in behind the house, as previously described by the court.
On another occasion while in the same bed with her father he caused her to be placed on top of him, forced her to spread her legs and attempted to place his penis in her vagina.
All of these instances are alleged to have occurred before the birth of her little brother, who is now six years old. Additionally, they all are alleged to have occurred before she went to see Dr. Sisón, and nothing has occurred since that time. The elements of the crime of indecedent behavior with a juvenile are that: (1) the defendant must have committed a lewd and lascivious act on the person of a victim; (2) that the victim was under the age of 17 and more than two years younger than the defendant at the time of the offense; (3) that the defendant was at least 17 years of age at the time of the alleged offense, and (4) that the defendant acted with a specific intent to arouse or gratify his own sexual desires or the sexual desires of the victim. A person who has a specific intent to commit a crime and does an act for the purpose of intending to commit this crime to direct and accomplish this object is guilty of an attempt to commit the crime intended.
It is obvious to this court that any defendant who has attempted to place his penis against the vagina of an 11- or 12-year-old child or a defendant who has placed his hand against the vagina of an 11- or 12-year-old child has attempted to commit a lewd and lascivious act, with the specific intent of arousing or gratifying his own sexual desires.
In this case, the evidence is established that the victim was under the age of 17 at the time of the incident; the defendant was over the age 17 and there were more than two years difference in their age. As the psychologists have testified, [the juvenile victim] ... has extreme personal difficulties created by these relationships. Her love for her mother will cause her to endure almost anything, even returning to the home and the very presence of the embarrassment. Her borderline- IQ and lack of sexual sophistication as well as her consistency in presentation, in this court’s opinion, precludes the fabrication of the testimony. The court believes that [the juvenile victim] ... would do almost anything for the love of her mother, but when called upon, her religious beliefs and her inner strength require that she be truthful regardless] of external pressure.
This court believes [the juvenile victim] ... and this court believes that the State has proven its case to all five counts, beyond a reasonable doubt.”
After reviewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found that the State proved beyond a rea *243 sonable doubt that the defendant committed the crimes for which he was convicted.
Therefore, this assignment lacks merit.
EXCESSIVENESS OF SENTENCE
Defendant contends that the sentencing court’s imposition of three and one-half years at hard labor on each of the five counts of attempted indecent behavior with a juvenile, as well as the specification that three counts be served consecutively, constitutes a constitutionally excessive sentence.
Although defendant’s sentences are all within the statutory limits of LSA-R.S. 14:27 and 14:81, we have stated that even a legal sentence may be excessive. State v. Maddox, 542 So.2d 794 (La.App. 3rd Cir. 1989). The law and jurisprudence involving the imposition of sentences within the statutory limits are well established and will not be repeated. State v. Francis, 554 So.2d 257 (La.App. 3rd Cir.1989).
In the case sub judice the sentencing court considered, and fully articulated, the guidelines of LSA-C.Cr.P. Art. 894.1 as they applied to the facts supporting the sentences imposed.
The sentencing court, referring to the presentence report ordered at the conclusion of trial, found that defendant had no prior criminal convictions. However, on the basis of factors brought to light in the presentence investigation report, none of which were challenged by defendant, it found that defendant’s moral character was repugnant. The sentencing court noted instances where defendant allowed the young children in his care to view hardcore pornographic movies, as well as defendant’s reputation among acquaintances as a flagrant adulterer who suffered from being oversexed.
Furthermore, the sentencing court characterized the offenses as most despicable. It observed that the offenses were committed over a period of years, and that it was evident that the juvenile victim suffered great psychic damage as a result of defendant’s actions. Dr. Rhea characterized the juvenile victim at one point as “not psychologically surviving,” and that her state was “anxiety laden[ed].”
In addition, the sentencing court was concerned that since the victim had returned to the household of her mother and adoptive father, a move characterized by the psychological testimony as one compelled by the victim’s love of her mother, defendant posed an undue risk that he would commit the same or similar acts if not incarcerated.
In conclusion, the sentencing court found that the mitigating factor of defendant’s crime-free past was overshadowed by the great preponderance of aggravating factors. On this basis, the sentencing court concluded that any lesser sentence would deprecate the seriousness of the crimes and mock the suffering that this victim endured and would endure for many years.
Considering the entirety of the factors relied upon by the sentencing court, we do not find defendant’s sentence to be grossly out of proportion to the seriousness of the offenses, nor is it nothing more than the needless infliction of pain and suffering. State v. Bonnano, 384 So.2d 355 (La.1980). When considered in light of the harm done to society and to this juvenile victim, the punishment chosen by the sentencing court for these crimes is not so disproportionate as to shock our sense of justice.
This assignment of error lacks merit.
DECREE
For the foregoing reasons, defendant’s convictions and sentences are affirmed.
AFFIRMED.